AUDUBON PARK REALTY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9629.   Promulgated April 16, 1927.

1. Where the Commissioner computed the gain under the Act of 1918 from a sale of property acquired prior to March 1, 1913, by using March 1, 1913, value as a basis, and the petitioner establishes a greater value as of that date, the value proven should be substituted for that determined by the Commissioner as the basis, though cost is undisclosed, as the latter element is not essential to the computation, it being presumed that the March 1, 1913, value determined by the Commissioner was greater than cost, for the effect of increasing such value as a basis for computing gain is to get further away from the alternative basis, cost.

2. The March 1, 1913, value of a real estate subdivision determined from opinion evidence.

3. A bad debt deduction disallowed, where debtor was known to have been insolvent in years prior to the one in which the deduction was claimed.

*John B. Baskin, Esq.,* for the petitioner.
*L. C. Mitchell, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency in income and profits tax for the year 1919, in the amount of $50,655.39. This deficiency arises from a determination by the Commissioner of a gain of $152,801, resulting from a sale by the petitioner in 1919, of 353 acres of land, to the United States, and from his disallowance as a deduction of a promissory note of G. R. Hunt, which petitioner claims was found to be worthless and was charged off during the year 1919.

### FINDINGS OF FACT.

Petitioner, whose original name was Prestonia Realty Co., is a Kentucky corporation, with its principal office at Audubon Park, Louisville, Ky. Prior to 1910, but at what cost does not appear, the Prestonia Realty Co. acquired approximately 760 acres of land, situated about two miles south of the present limits of the City of Louisville, Ky. The corporation dedicated this property as a subdivision for residential purposes. Streets, blocks, sidewalks and golf links were laid out on the plat and dedicated to the use of the purchasers of lots in the subdivision.

The whole 760 acres may be divided into three parts. The northerly part, containing 230 acres and being that portion nearest the City of Louisville, was first improved and put on the market. These 230 acres had been improved prior to March 1, 1913, as follows: Streets and sidewalks had been constructed over the greater part of it. A 6-inch water main, which connected with the city water system, had been laid at the expense of the company. Electricity for lighting purposes had been brought in, as was also the telephone. On March 1, 1913, negotiations were in progress with the Louisville & Interurban Railroad Co., looking to the extension of its line into the park, and the operation of a 20-minute service. The contract for this facility was finally made on March 31, 1913. South of the 230 acres was the golf course, which contained 129.5 acres. Prior to March 1, 1913, the golf links had been improved, and a clubhouse had been erected. The remainder of the 760 acres lay south and east of the golf course, and bordered thereon. This remaining portion was, on March 1, 1913, unimproved, except that some leveling had been done and trees had been planted. Prior to March 1, 1913, there had been laid out in this portion, but not constructed, except along the northern part thereof, streets and drives which had been dedicated to the property owners of the whole subdivision. This portion of the land contained the 353 acres which were sold to the United States.

The following sales were made prior to March 1, 1913:

In 1909 and 1910, 38 lots were sold for the aggregate amount of $74,951.98, or at the average price per acre of $3,098.00. In 1911,

one lot of 90 by 200 feet was sold for $1,200. In 1912, 36 lots were sold for the sum of $38,695, or at about $3,225 per acre. In 1913, and prior to March 1, only 1 lot of 50 by 200 feet was sold, for the price of $620.

At the outbreak of the World War, the Government proposed to establish an army camp near the City of Louisville. The National Camp Land Co. was organized for the purpose of acquiring land for the camp. The petitioner leased to this company the 353 acres in controversy, for the term of two years, with the privilege of three additional years, at a rental of one dollar per annum. This lease was assigned by the National Camp Land Co. to the United States, and the land became part of Camp Taylor. In 1919, the United States purchased the 353 acres for the sum of $301,351. The Commissioner computed the deficiency upon the March 1, 1913, value of the tract, which he placed at $123,500, or at $350 per acre.

In 1911, what are called the Smyser interests, purchased two-thirds of the capital stock of petitioner for $25,000 cash, and their obligations to pay $25,000 of the floating debt of the petitioner and $200,000 of its then existing mortgage debt.

There was situated on the 353 acres a nursery, which was destroyed by the Government and for which the Commissioner has allowed the petitioner the sum of $25,000, or has added, in computing the gain, to the March 1, 1913, value of the 353 acres (i. e. $123,500) the sum of $25,000. This amount allowed for the nursery is not in controversy. The sole issue is, What was the March 1, 1913, value of the 353-acre tract in controversy, exclusive of the nursery?

The value of the land on March 1, 1913, exclusive of the nursery, was $800 per acre, or in all, $282,400.

In the summer of 1913, G. R. Hunt, one of petitioner's stockholders, was hard pressed by his creditors. In order to help him settle with them, the petitioner, on August 1, 1913, conveyed to him, free of lien, several lots in the subdivision, in consideration of his note of that date of $50,000. The note bore interest at 5 per cent per annum. The lots were disposed of by Mr. Hunt in the settlement of his debts. The only property owned by Mr. Hunt at this time, was a house and lot in the subdivision (whether encumbered or not, does not appear), and 80 shares of petitioner's stock. This stock was pledged to secure the note, and also to secure a note of Mr. Hunt to the petitioner, dated November 24, 1915, for $2,747.82, and a mortgage debt of the petitioner to the Fidelity & Columbia Trust Co., to the extent of $105,000. The stock was sold at judicial sale, on June 18, 1917, for $3,043.86. It does not appear on which debt this sum was credited. Subsequent to the date of this sale, Mr. Hunt possessed no property whatever. In 1916 or 1917, Mr. Hunt, who

had a wife and three children dependent upon him for support, moved to Cincinnati, Ohio, and accepted a position in a brokerage concern at a salary, the amount of which does not appear, and perhaps also on a commission basis. There was no change in Mr. Hunt's financial condition from June 17, 1917, until his death, which occurred in 1924. Mr. Hunt and the other stockholders of the company had been intimate friends for many years. The petitioner's minute book contains the following:

At a called meeting of the stockholders of the Audubon Park Realty Company, held in the Company's office, 1003 Starks Bldg., on Monday, Sept. 15th, 1919, at 10 o'clock A. M., there were present Messrs. D. A. Keller, Jacob L. Smyser, Jas. L. Smyser, H. L. Smyser and E. G. Steiden, representing all of the stock of said Company, as also the Board of Directors of same.

Mr. H. L. Smyser reported an interview with Mr. G. R. Hunt of Cincinnati on Sept. 5th, at which interview Mr. Hunt announced that on account of his many obligations, he had lost several chances of entering into business on his own initiative, and that he was confronted with either taking the bankruptcy law or arranging in some way with his creditors for the cancellation of his debts. Mr. Hunt reported that outside of his obligation to his Family, with whom he could arrange matters, and the obligation of $50,000 and interest to the Audubon Park Realty Company that he owed only about $900, which amount he could take care of. He further said he knew the request was an unusual one, but that he had absolutely no chance of paying his obligation to us and asked for a cancellation of same. After discussing the matter in its every phase and realizing that we have no chance of having this note paid, and that through bankruptcy proceedings a stigma would be held against him through life, it was moved by Mr. H. L. Smyser, seconded by D. A. Keller, that the Secretary be instructed to return to Mr. Hunt his note for $50,000 and write to him the following letter:

G. R. HUNT, ESQ.,
c/o W. E. Hutton & Co.,
Cincinnati, Ohio.
DEAR MR. HUNT:

I have been instructed by the Directors of our company, who own all of the stock, to enclose you your note of August 1st, 1913, for $50,000 to this Company, and to say that we sincerely hope that through this action on our part you will be enabled to again establish yourself in some business that will prove satisfactory far beyond your most sanguine expectations.

With best wishes, we are,
    Yours very truly,

                                        AUDUBON PARK REALTY COMPANY
            (Signed)        E. G. STEIDEN, Secy.

There being no further business, the meeting on motion adjourned.
                            (Signed)        E. G. STEIDEN, Secy.
(Signed)
Jas. L. Smyser,
        Vice-Pres.

CINCINNATI, *Sept. 19, 1919.*

To the OFFICERS AND DIRECTORS
　　　　OF THE
AUDUBON PARK REALTY COMPANY
　　　　　Louisville, Ky.

GENTLEMEN :

Your valued favor of the 16th instant, with my enclosed note for Fifty Thousand Dollars received.

I am at a loss to express in adequate terms my sincere gratitude for this great kindness. I thank you one and all, and trust some day soon I can assure you in person of my keen appreciation.

　　　　Sincerely yours,

　　　　　　　　　　　　　　　(Signed)　　　G. R. HUNT.

## OPINION.

MILLIKEN : In order to ascertain the gain or loss, under the Revenue Act of 1918, resulting from the sale of property acquired prior to March 1, 1913, the following three elements must appear: (1) The cost of the property, (2) its value on March 1, 1913, and (3) its sale price (*United States* v. *Flannery*, 268 U. S. 98; *McCaughn* v. *Ludington*, 268 U. S. 106; *Appeal of Anniston City Land Co.*, 2 B. T. A. 526).

Here the cost of the 353 acres is absent. However, the Commissioner based his determination of deficiency on 1913 value, and we must assume that in so doing, he followed the law, and therefore, that the March 1, 1913, value was greater than, or at least equal to, the cost of the property. Since the taxable gain is ascertained by deducting from the sale price the cost of the property or its March 1, 1913, value, whichever is the greater, it follows that adding to the March 1, 1913, value results in getting further away from cost. On the other hand, since loss is computed by deducting the sale price from the cost or the March 1, 1913, value, whichever is the lesser, any addition to either of said values has the effect of bringing them together, and the absence of a knowledge of one makes it impossible to say where they will meet. The difference between the computation of loss and gain in such cases, is obvious. We must, therefore, proceed upon the assumption that the March 1, 1913, value of the tract of land involved was greater or was equal to its cost (*Appeal of George W. Baumhoff*, 3 B. T. A. 392; *Appeal of Gilbert Butler*, 4 B. T. A. 756).

In fixing the March 1, 1913, value at $123,550, the Commissioner to a large extent based his finding on an appraisement of the tract made on February 5, 1913, for the purpose of ascertaining whether a then existing mortgage deed was well secured. The appraisal fixed a value of that portion of the 760 acres involved in this proceeding at $300 per acre. It clearly appears from the evidence that

the president of the trust company which held the mortgage directed that the unimproved part of the tract should be appraised as " acre property" without reference to its value for subdivision purposes, and that the appraisal was made in pursuance of this direction. It further appears that the appraisers kept in view the fact that under the laws of Kentucky the mortgage could only be foreclosed by proceedings in court, followed by a judicial sale. The property was, therefore, not only appraised merely as acre property, but its value as such was placed at a very conservative figure.

The Commissioner also relies on the affidavit of Alphons Schoenbachler, who is a dairyman, and owns land in the neighborhood, and who in his affidavit, valued the 353 acres as follows: 200 acres at $275 per acre, and 153 acres at $350 per acre. The Commissioner introduced a letter from the petitioner's vice president, dated March 29, 1921, in which both the cost and the March 1, 1913, value were fixed at $99,783.46.

It is shown that the vice president took his figures from the books of the company and that the $99,783.46 did not represent either the cost or the March 1, 1913, value of the property, but was a balance remaining on the debit side of the real estate account as of December 31, 1918, on unsold portions of the subdivision.

Schoenbachler's deposition was taken and it now appears that he possesses little knowledge of real estate values except when such property is used for farming or dairying purposes.

The deposition of D. F. Murphy, one of the men who made the appraisement of February 5, 1913, was taken and he now testifies that in his opinion the 353 acres, when viewed as subdivision property and when the advantages which had been secured prior to March 1, 1913, to the subdivision as a whole, are taken into consideration, were worth as of that date, $1,000 per acre. It appears that Mr. Murphy, on October 6, 1924, gave as his opinion, in his affidavit, that the property was worth on March 1, 1913, from $750 to $800 per acre. Mr. Murphy had for 20 years prior to 1904, been tax assessor of the City of Louisville, and since that date he has been continuously employed by the Fidelity Trust Co. and its successor, the Fidelity & Columbia Trust Co., in charge of appraisals.

Among the other witnesses introduced by the petitioner, were four realtors of long experience: Jo. Hieatt, Walter S. Adams, Arthur E. Mueller, and George Henriott. These witnesses placed the March 1, 1913, value at from $850 to $1,000 per acre. The witnesses, Hieatt, Mueller and Henriott, state that as of March 1, 1913, the value of the 353 acres was enhanced to the extent of from $350 to $500 per acre by the improvements made on the remainder of the

tract, and by the fact that a purchaser of lots in this tract had the right to participate in these benefits.

Taking these figures in connection with the appraisement of February .1, 1913, and also in connection with the valuations arrived at by- the various experts, it is fair to conclude that the 353-acre tract was worth $800 per acre on March 1, 1913.

The burden is on the petitioner to show not only that the $50,000 note of G. R. Hunt was worthless and charged off during the year 1919, but also that it was ascertained to be worthless during that year. This burden the petitioner failed to meet. It appears that the financial condition of Hunt underwent no material change after the sale of his stock in June, 1917. The Commissioner did not err in refusing to allow this deduction.

> *Judgment will be entered on 15 days' notice, under Rule 50.*